[S. F. No. 6867.    In Bank.—October 1, 1914.]

PACIFIC GAS AND ELECTRIC COMPANY, Petitioner, v. E. D. ROBERTS, as Treasurer of the State of California, and W. F. McCLURE, as State Engineer of the State of California, Respondents.

TAXATION—PUBLIC SERVICE CORPORATIONS—GAS AND ELECTRIC COMPANY—EXEMPTION FROM PAYMENT OF LICENSE-TAX IMPOSED BY MOTOR VEHICLE ACT.—Section 14 of article XIII of the state constitution, imposing taxes upon the operative property of public service corporations at specified percentages of their gross receipts, and providing that such taxes shall "be in lieu of all other taxes and licenses, state, county and municipal" upon such property, has the effect to exempt a public service corporation, organized under the laws of the state of California, and engaged in the business of transmitting and selling gas and electricity in that state, from the payment on motor vehicles owned by it, and used exclusively in the operation of its public service business in that state, of the license-tax imposed on such vehicles by the Motor Vehicle Act.

ID.—LICENSE FOR MOTOR VEHICLES AN EXCISE OR PRIVILEGE TAX—NOT A RENTAL OR TOLL CHARGE FOR USE OF HIGHWAYS.—The license charge imposed by the Motor Vehicle Act is an excise or privilege tax, established for purposes of revenue in order to provide a fund for roads under the dominion of the state authorities. It is not a tax imposed as a rental charge or a toll charge for the use of the highways owned or controlled by the state.

ID.—METHOD OF TAXING PUBLIC SERVICE CORPORATIONS—SUBSTITUTE FOR AD VALOREM AND PRIVILEGE TAXES.—The method of taxation

of public service corporations adopted by section 14 of article XIII of the constitution is intended as a substitute not only for the *ad valorem* taxes theretofore levied upon their franchises and physical properties, but also for all privilege taxes, whether the same are imposed upon the right to conduct business, or upon specific personal property as a condition of the right to use it generally or for some specific purpose.

APPLICATION for a Writ of Mandate directed to the treasurer and to the state engineer of the State of California.

The facts are stated in the opinion of the court.

Garret W. McEnerney, and Wm. B. Bosley, for Petitioner.

U. S. Webb, Attorney-General, Raymond Benjamin, Chief Deputy Attorney-General, and John T. Nourse, Deputy Attorney-General, for Respondents.

HENSHAW, J.—This is an original petition in mandate to compel the respondent, E. D. Roberts, as treasurer of the state of California, to accept the applications for registration of certain motor vehicles, the property of the petitioner, and to signify in proper form to the department of engineering of the state of California that no fees are chargeable to the petitioner in the matter of its applications, and further to compel the respondent, W. F. McClure, as state engineer of the state of California, to file these applications when so presented and alphabetically and numerically register the motor vehicles described in the applications, and do all other acts and things in this regard required of him by law, and in particular by sections 4 and 5 of the Motor Vehicle Act. (Stats. 1913, p. 641.)

The petitioner is a public service corporation, organized under the laws of the state of California, and engaged in the business of transmitting and selling gas and electricity in the state of California. It owns a number of motor vehicles, automobiles, and motorcycles, which are used exclusively in the operation of its public-service business in the state of California. The Motor Vehicle Act requires that motor vehicles shall be registered, and in registering shall pay a license fee or tax fixed under the terms of the act, and graduated in proportion to the horsepower of such vehicles. Respond-

ents contend that it is not their duty to register these vehicles excepting upon payment by petitioner of the license fees contemplated by the Motor Vehicle Act. Petitioner contends that it is entitled to have its vehicles registered without the payment of any fee, by force of section 14 of article XIII of the constitution of this state, which section has relation to the taxation of public service corporations. In support of this position petitioner argues either that the Motor Vehicle Act must be construed as excluding from its contemplation in the matter of the payment of the license fee vehicles so owned and exclusively used, as operating property of such public corporations, or, if the conclusion is necessary that such vehicles are included within the purview of the Motor Vehicle Act, it then follows that, at least to this extent, the Motor Vehicle Act is void as being in conflict with and in contravention of section 14 of article XIII of our constitution.

The question is presented on demurrer to the petition, so that over the facts there is no controversy. The proposition is one strictly of law.

Article XIII of section 14 of the constitution declares as follows:

"Taxes levied, assessed and collected as hereinafter provided upon . . . telegraph companies; telephone companies; companies engaged in the transmission or sale of gas or electricity . . . ; and taxes upon all franchises of every kind and nature, shall be entirely and exclusively for state purposes, and shall be levied, assessed and collected in the manner hereinafter provided. The word 'companies' as used in this section shall include persons, partnerships, joint-stock associations, companies, and corporations.

" (a) . . . all telegraph and telephone companies; and all companies engaged in the transmission or sale of gas or electricity shall annually pay to the state a tax upon their franchises, roadways, roadbeds, rails, rolling stock, poles, wires, pipes, canals, conduits, rights of way, and other property, or any part thereof, used exclusively in the operation of their business in this state, computed as follows: Said tax shall be equal to the percentages hereinafter fixed upon the gross receipts from operation of such companies and each thereof within this state. . . .

"The percentages above mentioned shall be as follows: . . . on all telegraph and telephone companies, three and one-half

per cent; on all companies engaged in the transmission or sale of gas or electricity, four per cent. Such taxes shall be in lieu of all other taxes and licenses, state, county and municipal, upon the property above enumerated of such companies except as otherwise in this section provided; *provided,* that nothing herein shall be construed to release any such company from the payment of any amount agreed to be paid or required by law to be paid for any special privilege or franchise granted by any of the municipal authorities of this state.''

The vital point in controversy centers upon the construction of the sentence ''Such taxes shall be in lieu of all other taxes and licenses, state, county, and municipal, upon the property above enumerated.'' But before entering into a discussion of the meaning of this language, which meaning must of course be determined from its reading in connection with the whole constitutional provision of which it is a part, a few words may be said as to the history of the change in our fiscal system touching the taxation of public utilities. Under the system formerly in vogue an attempt was made to place an *ad valorem* tax upon the properties of these utilities, including therein their franchises. In addition to this privilege taxes of various kinds and amounts were imposed by the different authorities. As a necessary result many of these utilities, such as the petitioner herein, owning property in many counties of the state and supplying its utility to many municipalities, were subjected: 1. To assessments by county assessors; 2. To assessments by municipal assessors; and 3. To privilege taxes by such municipalities as saw fit to impose them. The method was crude and cumbersome, and it came to be believed that it was unequal and unjust. It was recognized that a small amount in value of real and personal property could, by use in business, bring in returns by way of revenue greatly in excess of the separate values of the properties employed. This earning capacity it was felt had a value which should be taxed, and no better method of taxing it was apparent than that which levied a percentage upon the gross revenue returns. This we find set forth in the ''Report of the Commission on Revenue and Taxation of the State of California'' (1906), pp. 193 and 194, in the following language: ''The inadequacy of the property taxed when applied to express companies has been strikingly pointed out by the supreme court of the United States. In the so-called Ohio

express company cases (see *Adams Express Co.* v. *Ohio,* 165
U. S. 194, [41 L. Ed. 683, 17 Sup. Ct. Rep. 305], the court
said that it was 'unity of use' which enabled $23,400 worth
of horses, wagons, safes, and so on, in the state to produce
$275,446 in a single year." The next difficulties which pre-
sented themselves were those which had to do with the legal
requirements that taxes should be equal and uniform and
should be levied upon "property." The supreme court of
the United States hesitated to declare that a percentage tax
upon the gross earnings of a corporation was in any true
sense identical with an *ad valorem* tax upon the properties
of the corporation. Thus in *Postal Telegraph-Cable Co.* v.
*Adams,* 155 U. S. 697, [39 L. Ed. 316, 15 Sup. Ct. Rep. 268,
360], we find the court saying: " 'By whatever name the
exaction may be called, if it amounts to no more than the
ordinary tax upon property or a just equivalent therefor,
ascertained by reference thereto, it is not open to attack as
inconsistent with the constitution.' The supreme court of
Minnesota construed the tax to be a property tax, measured
by the gross earnings within the state, which, under their
construction of the tax, included the earnings here in ques-
tion. That court held that the statute was a part of a system
long in force in Minnesota, passed under the authority of the
state constitution, and was intended to afford a means of
valuing the property of express companies within the state.
While the determination that the tax is a property tax meas-
ured by gross receipts is not binding upon this court, we are
not prepared to say that this conclusion is not well founded,
in view of the provisions and purposes of the law. In this
connection the language of Mr. Justice Peckham in *McHenry*
v. *Alford,* 168 U. S. 651, 671, [42 L. Ed. 614, 18 Sup. Ct. Rep.
242], while it was not necessary to the decision of the case
is nevertheless apposite: 'When it is said, as it is in this act,
that the tax collected by this method shall be in lieu of all
other taxes whatever, it would seem that it might be claimed
with great plausability that a tax levied under such circum-
stances and by such methods was not in reality a tax upon
the gross earnings, but was a tax upon the lands and other
property of the company, and that the method adopted of
arriving at the sum which the company should pay as taxes
upon its property was by taking a percentage of its gross
earnings.' " Without pausing here to review the decisions

of the supreme court bearing upon the question, but contenting ourselves with a subsequent reference to some of them, it may be said that the conclusions of the supreme court were that property used in the public service frequently acquired a value in the use, which value was something greater than the value of the property not engaged in such use; that by the systemization and unification of such properties in use they in the aggregate acquired a special value by virtue of this unity of use; that this special value was in the nature of property; that a fair tax upon gross earnings bore such a relation to the values of these properties under their unity of use as to justify such a tax upon revenue as being a legal and commutated or substituted tax for other taxes which were or might have been levied.     (*Maine* v. *Grand Trunk Ry.,* 142 U. S. 217, [35 L. Ed. 994, 12 Sup. Ct. Rep. 121]; *Cleveland & St. Louis Ry. Co.* v. *Backus,* 154 U. S. 439, [38 L. Ed. 1041, 14 Sup. Ct. Rep. 1122]; *Erie Ry.* v. *Pennsylvania,* 158 U. S. 440, [39 L. Ed. 1046, 15 Sup. Ct. Rep. 900]; *Adams Express Co.* v. *Ohio,* 165 U. S. 194, [41 L. Ed. 683, 17 Sup. Ct. Rep. 305]; *United States Express Co.* v. *Minnesota,* 223 U. S. 335, [56 L. Ed. 459, 32 Sup. Ct. Rep. 211].)

So much for the justness and reasonableness and legality of the new method.     Further, it was believed that the income of the state could be largely drawn from these sources with great advantage both to the state and to the public service utilities, in that the method would be simple, direct, and inexpensive as compared with the existing method, necessitating the action of many assessors and numerous appeals to boards of equalization, and, also, that the new method would remove all temptation to such utilities to engage in political activity.     Having subjected public utilities to this revised form of taxation, it was for the people under their constitution to say whether these new taxes should be all of the taxes and charges imposed upon such corporations, and if not all then for what purposes could they or their properties be further taxed.     For manifestly it was competent for the constitution to declare that this commutated tax should be in lieu of all taxes, should be in lieu only of *ad valorem* taxes, or that it should not forbid the right to levy privilege taxes. What the constitution did say in this regard is found in the sentence expressly quoted and adverted to, and it is to the construction of this sentence we are thus brought.

The interpretation put on it by petitioner has been outlined. It contends that the license fee sought to be exacted from it is a charge expressly prohibited in the very language of the constitution; that this license fee is a privilege tax sought to be imposed upon the personal property of the corporation, which personal property is exclusively used in its business and necessary to the unified use of its operative property. Or in other words that the demand of respondents is that petitioner shall pay this excise tax or privilege tax as a condition of its right to devote its operative properties to the remunerative use in the conduct of its business, for which remunerative use it pays a tax upon its gross revenues, which the constitution itself declares shall be exclusive of all other taxes or license fees upon its property.

Respondents answer that the constitution means that the commutated tax upon gross revenue is a substitution only for previous existing *ad valorem* taxes upon physical properties and franchises; that the constitution does not include in its inhibition the right to levy a privilege or excise tax. But that if it does include this inhibition, then this is not a privilege tax but is in the nature of a rental charge or a toll exaction; or finally if no one of these positions is sustainable, it is a measure attributable to the legitimate exercise of the state's police power.

Certain of these arguments of respondents are disposed of by the case of *In re Schuler*, 167 Cal. 282, [139 Pac. 685], where the constitutionality of this Motor Vehicle Act came under review. It is there pointed out that an enormous revenue will be and is obtained under the act and that this revenue, over and above the small expense of collecting it, is to be devoted to the maintenance, repair, and construction of highways. It is declared that the act is not referable to the police power, this court saying: "The repair of public roads is not a police measure, yet it is evident that the bill was passed for the principal purpose of raising revenue for use in the upkeep of such highways." The true character of the license fees and charges is summed up in the following sentence: "The contention is made (and correctly made), that it imposes an excise tax or privilege for the purpose of providing a fund for roads under the dominion of the state authorities." This explicit declaration as to the purpose and character of the Motor Vehicle Act is sufficient itself to nega-

tive the contention of respondents, that the act may be construed as imposing a rental charge or toll charge for the use of the highways. But as those propositions were not specifically considered in the Schuler case and are here insistently urged, they demand brief consideration.

The contention that the Motor Vehicle Act should be construed as imposing a rental charge for the use of highways owned or controlled by the state is based solely upon the decision of the supreme court in *St. Louis* v. *Western Union Tel. Co.,* 148 U. S. 93, [37 L. Ed. 380, 13 Sup. Ct. Rep. 485], and considered at length by this court in *Western Union Tel. Co.* v. *Hopkins,* 160 Cal. 106, [116 Pac. 557]. In the federal case the telegraph company had made a permanent and exclusive appropriation of a part of the public streets of St. Louis by telegraph poles. The holding of the supreme court was that this permanent occupation of a portion of the public highway to the absolute exclusion of the public from the enjoyment of that part of the highway was something entirely different from the common right to the use of the highways for purposes of transitory locomotion, and that the charge which St. Louis exacted of five dollars per pole for poles so occupying portions of the highway was "more in the nature of a charge for the use of property belonging to the city— that which may properly be called rental. . . . The city has attempted to make the telegraph company pay for an appropriation to its own and sole use a part of the streets and public places of the city. It is seeking to collect rent." It is not easy to adjust the law of that case to the facts of this case, where the use which petitioner's vehicles propose to make of the highways is identically that which of common right all persons and vehicles may make. If it is a rental charge at all, then a like rental charge may be imposed upon every pedestrian as well as upon every vehicle traveling upon our highways. The common use of the highways is open to all. For the permanent and exclusive use of a portion of the highway, a charge may be made. Such is the whole of the law upon this proposition.

As little force can be given to the next contention, that the Motor Vehicle Act should be regarded as an act imposing a toll for the use of the highways. Support for this proposition is sought to be derived from the two cases of *Huse* v. *Glover,* 119 U. S. 543, [30 L. Ed. 487, 7 Sup. Ct. Rep. 313],

and *Sands* v. *Manistee River Imp. Co.*, 123 U. S. 288, [31 L. Ed. 149, 8 Sup. Ct. Rep. 113]. Mr. Justice Field wrote the decisions in both cases. They grew out of a similar state of facts. Certain of the states had by expensive works improved the navigation of their rivers. For the use of these improvements tolls were charged. Here was a portion of a natural highway artificially improved at a large expense. But the federal constitution guaranteed the free right of navigation. It was held by the supreme court of the United States that a toll for the use of a portion of such a particular highway artificially created or improved was not a violation of the federal constitution. But the effort here made is not to charge a toll for the use of a toll-road. It is exacting a fee from every automobile, the amount of which is based upon the horsepower of the automobile for its entry upon or use of any highway in the state, improved or unimproved, within a municipality or without. A similar effort was made by the city of Chicago, which improved by dredging and otherwise the Chicago River, and then imposed a license fee upon certain crafts using the Chicago River. An effort was made to justify this charge as being a toll under the authority of *Huse* v. *Glover* and *Sands* v. *Manistee River Imp. Co.* Justice Field again wrote the opinion of the supreme court (*Harmon* v. *City of Chicago*, 147 U. S. 396, [37 L. Ed. 216, 13 Sup. Ct. Rep. 306]), and scouting the argument that the license fee should be "treated as in the nature of a toll or compensation for the expenses of deepening the river" declared: "But the plain answer to this position is that the license fee is not exacted upon any such ground, nor is any suggestion made that any special benefit has arisen or can arise to the tugs in question by the alleged deepening of the river. The license is not exacted as a toll or compensation for any specific improvement of the river, of which the steam barges or tugs have the benefit, but is exacted for the keeping, use, or letting to hire of any steam tug, or barge or tow boat, for towing vessels or craft into the Chicago River, its branches, or slips connected therewith." So here, the charge is a fee exacted of motor vehicles for the right to use any public highway. It is not a toll. It is a revenue measure pure and simple.

It being thus clear both upon principle and upon the adjudication of the Schuler case that this license charge is a privilege tax, established for purposes of revenue and forbidding

petitioner's automobiles to use the public highways until payment thereof, we come to the principal contention of respondents: That, conceding it to be such a tax, still it is not a tax the levying of which is forbidden by the constitution, and therefore it may justly be laid. Respondents' argument is the following: The new method of taxation was adopted solely as a substitute for the *ad valorem* taxes theretofore levied upon franchises and physical properties; it was not designed by the framers of this constitutional amendment to forbid the levying of any other kind of a tax either upon the corporations or upon their physical properties, and as the taxing power is of so vital importance that it is of the essence of the existence of a government, no intendment should be indulged in any case that the state has relinquished any part of this all important power. The principle of construction here declared is unimpeachable. In cases of doubt upon such questions the doubt will always be resolved in favor of the sovereignty. (*Providence Bank* v. *Billings,* 4 Pet. 514, [7 L. Ed. 939].) But it is to be noted here that the principle is wholly inapplicable, in that the state, so far from surrendering its taxing powers, has simply declared a method by which it will tax such corporations, coupled with the declaration that though the percentage upon incomes is fixed, the percentage may be increased by the legislature from time to time, as in fact the legislature has done. So far as goes the argument, that the people meant in this constitutional provision only to declare that the franchises and physical properties should no longer be subject to an *ad valorem* tax, the determination of this will depend solely and exclusively upon the meaning of the language which the people have employed. Some light has already been shed upon this meaning by two decisions of this court, that of *City and County of San Francisco* v. *Pacific T. & T. Co.,* 166 Cal. 244, [135 Pac. 971], and *Hartford Fire Ins. Co.* v. *Roberts, ante,* p. 270, [142 Pac. 839]. In the first of these cases the city of San Francisco imposed that form of a privilege tax known as an occupation tax upon the right of the defendant, a public service corporation, to conduct its business, requiring it to pay a license fee based upon its gross receipts. It was held that under the inhibition of the constitutional provision which we are here considering such a privilege tax was void. In the second case the state itself, under its state corporation License Tax

Act, demanded of a foreign corporation doing business in this state the license fee as a condition of its right to continue in its business. Insurance companies paying the proper proportion of their gross revenues are included in the constitutional provision under consideration. It was held that this constitutional provision forbade the exaction of this privilege occupation tax upon the right of the insurance company to conduct its business. Here are two declarations that privilege taxes, in their nature occupation taxes, may not be imposed because the constitution has said that the tax imposed by the state "shall be in lieu of all other taxes and licenses, state, county and municipal upon the property above enumerated of such companies." The essential difference between an *ad valorem* tax and any form of privilege tax is that the *ad valorem* tax is based upon the value of the property, tangible or intangible. The privilege tax need not be based upon such value at all. Privilege taxes themselves fall into two general classes: the first a tax upon that intangible thing known as the right to conduct business, and the second a tax upon specific personal property as a condition of the right to use it generally or for some specific purpose. Instances of the two forms of privilege tax will readily occur. Thus, such a tax may be imposed upon the right to conduct the business of a taxicab company, and again a tax may be imposed upon each taxicab, to be paid before that particular piece of personal property may be employed in the business. Of course, as in the case of every tax and upon whatsoever form or kind of property it may be laid, in its essence, it is a tax upon the owner of the property.

With these distinctions in view, it is easy to be seen that the decisions above adverted to clearly declare that the privilege occupation tax is forbidden by the constitution. And yet certainly there is not so clear an inhibition against this tax as there is against the privilege tax upon the *property* exclusively used in the operation of the business. For in precise terms it is declared that the state tax shall be in lieu of all "other taxes and licenses . . . *upon the property* . . . of such companies." Respondents argue that this court in the telephone case, has placed a limitation and definition upon this constitutional provision which support their contention that at the utmost only that form of privilege tax known as occupation tax is prohibited, and that therefore this particu-

lar form of privilege tax, not laid directly upon the business but only upon certain operative properties of the business, is valid. The language relied on is the following: "Every word in the clause under discussion can be given a reasonable and legitimate effect by reading the term 'licenses' as including revenue charges of any character upon the exercise of the franchises which are declared to be taxable for state purposes only. In this way the phrase 'upon the property above enumerated' is made fully effective as qualifying both 'taxes' and 'licenses' preceding it, while no word is either ignored or distorted from its fair meaning." But respondents entirely mistake its meaning and import. The argument which this court was there called upon to meet was the direct opposite of the one here presented. The city and county of San Francisco was there advancing a contention utterly destructive of respondents' position here. It was contending that the language of the constitution in terms forbade the imposition of a tax upon the operative properties such as this, but did not in terms deny, and therefore should not by inference be held to deny, the right of the municipality to impose an occupation tax. A few extracts from the brief of the appellant city and county of San Francisco will establish this beyond question. We quote:

"A tax, such as the tax provided for by this ordinance, is not a property tax at all. It is not a tax imposed upon any of the property of the person taxed. It is an occupation or business tax.

"The intention of the legislature was clearly to prevent the levy of taxes of any sort (whether levied openly as property taxes or disguised as licenses) upon certain specified property of certain corporations. In an endeavor to carry out the legislative intent and in order to cover all taxes upon said property the word 'licenses' was used.

"In conclusion of this part of our argument we submit that the legislature did not use the words 'upon the property' without intent. The intent clearly was to relieve the property assessed from all taxes other than state taxes levied upon it under the constitutional amendment."

It was in answer to this argument that this court used the language relied on by respondents. It is too plain for discussion, therefore, that this court did not hold that taxes could be levied upon operative property, but that it did hold

that the language of the constitution forbidding taxes upon
operative property "included revenue charges of any char-
acter upon the exercise of the franchise." Wherefore it must
be concluded that this decision, if not directly against the
respondents' contention here made, at least lends no aid nor
support to that contention.

But it is only in deference to the arguments of the fiscal
and legal officers of the state that so much has been said upon
a proposition which, to the mind of the layman as well as of
the lawyer, is not debatable, under the plain and unambiguous
language of the constitution itself. We repeat, "Such taxes
shall be in lieu of all other taxes and licenses, state, county
and municipal, upon the property above enumerated." Where
is there room for the play of construction upon language so
plain as this, addressed to the facts of this case? With the
argument of respondents, that the framers of this article
were intelligent men and must be presumed to know what
they meant to say, we are in perfect accord. What they said
is so plain, so clear, so free from ambiguity and the possibility
of construction as to forbid debate. They declared that the
state tax should be in lieu of *all* other taxes and licenses. If
they meant that it should be in lieu of but some of those taxes
they would have said so. If they meant that it should be
in lieu only of *ad valorem* taxes they could easily and would
undoubtedly have said so. What they did say was that this
state tax, with the state's ability to increase it at will, should
be in lieu of *all* other taxes and licenses. If argument is re-
quired upon the meaning of plain words so clearly expressing
an obvious idea, it can only be because of an utter breakdown
in our written language in its ability to convey thought.
Additionally, it may be said, that the purpose of the constitu-
tion to exclude all other taxes and licenses is emphasized and
accentuated by the one exception which that instrument itself
declares when it provides that this inhibition against the levy-
ing of any or all taxes and licenses shall not be construed to
release these companies from pre-existing agreements to pay
specified sums of money.

And as a last word upon the subject, it may be pointed
out that if confirmation can be required upon so plain a prop-
osition, it is found in *Railroad Co.* v. *Harris*, 99 Tenn. 684,
[53 L. R. A. 921, 43 S. W. 115]. It was there held that rail-
road companies, by virtue of the language providing for a

commutated tax were not relieved from privilege taxes, the court in addressing itself to the particular language of the law, saying: "Exemption from *ad valorem* taxation no more includes exemption from privilege taxation than the imposition of an *ad valorem* tax includes the imposition of a privilege tax. If one imposition does not embrace both, one exemption does not embrace both." The court then proceeds: "It is not to be implied from what has been said that no exemption from privilege taxation could have been granted without naming the subject of such taxation and exempting it in so many words. That result could have been accomplished by a statement that the company was to have exemption from all taxation, or by any other form of expression that would, beyond doubt, disclose such an intention." In our constitution we have this exemption most completely, comprehensively, and explicitly expressed.

Let the mandate issue as prayed for.

Lorigan, J., Melvin, J., and Shaw, J., concurred.