[L. A. No. 10201. In Bank.—June 30, 1930.]

MORGAN ADAMS, INC. (a Corporation), Respondent, v. COUNTY OF LOS ANGELES, Appellant.

Everett W. Mattoon, County Counsel, and W. Sumner Holbrook, Jr., Deputy County Counsel, for Appellant.

Pillsbury, Madison & Sutro, Lawler & Degnan, Alfred Sutro and Eugene M. Prince for Respondent.

PRESTON, J.—Appeal by defendant County of Los Angeles from a judgment rendered against it upon its declination to answer plaintiff's complaint, following the overruling of demurrer thereto.

The action was one to recover under Political Code, section 3819, a certain item of $19,416.91, paid under protest as taxes levied by said defendant for the year 1926 upon a certain piece of real property in said county upon which

was located a ten-story class A concrete building of the assessed value of $501,730. Said building, together with the ground thereunder necessary for its use, was at the time in question leased by plaintiff to the Southern California Telephone Company, a public utility corporation, and was used exclusively by the latter corporation for office quarters for its various departments. It is conceded that the said building and ground thereunder were at all times legitimately used by said telephone company as a part of its operative property. Respondent states the sole question involved in the following language:

■ "The case involves the question whether property leased by a telephone company and used exclusively in its telephone business in this state is subject to local taxation merely because it is leased and not owned by the operating company, despite the provision of section 14 of article XIII of the Constitution that the gross receipts tax of telephone companies is 'in lieu of all other taxes and licenses, state, county and municipal' upon 'their franchises, . . . poles, wires . . . rights of way and other property, or any part thereof, used exclusively in the operation of their business in this state,' and despite the fact, hereafter shown, that the rates of the gross receipts tax were specifically fixed to make that tax the equivalent of a fair tax on all property used by public service corporations in their business, whether leased, owned or howsoever held."

This identical question, involving this same telephone company, has, since the institution of this present action, been passed upon and determined by the Supreme Court of the United States and its conclusion was in accord with the previous decision of the Circuit Court of Appeals of the Ninth Circuit. We refer to the case of *Hopkins* v. *Southern California Tel. Co.*, 275 U. S. 393 [72 L. Ed. 329, 48 Sup. Ct. Rep. 180], decided January 3, 1928. In the opinion written by Mr. Justice McReynolds, the question is stated, authorities cited and reasoning applied as follows:

"The argument against exemption of leased property from local taxation rests chiefly upon literal and narrow interpretation of words in sec. 14, Article XIII, California Constitution—' . . . all telegraph and telephone companies . . . shall annually pay to the State a tax upon *their* fran-

chises, . . . , poles, wires, pipes, canals, conduits, rights of way, and other property . . . used exclusively in the operation of their business'; and 'such taxes shall be in lieu of all other taxes and licenses, State, county and municipal, upon the *property* above enumerated of *such* companies.'

"But the Constitution plainly directs, 'taxes levied, assessed and collected as hereinafter provided upon . . . telephone companies . . . shall be entirely and exclusively for State purposes' and such companies 'shall annually pay to the State a tax upon their poles, . . . and other property, or any part thereof, used exclusively in the operation of their business.' And the Political Code provides (sec. 3664) that 'taxes levied, assessed and collected as hereinafter provided upon telephone companies shall be entirely and exclusively for State purposes and shall be assessed and levied by the State Board of Equalization'; (sec. 3664a) that 'all . . . telegraph and telephone companies . . . shall annually pay to the State a tax upon their . . . poles, wires . . . and any other property, or any part thereof, used exclusively in the operation of their business . . . '; (sec. 3664a-4) 'such taxes shall be in lieu of all other taxes and licenses, state, county, and municipal, upon the property above enumerated of such companies except . . . '; (sec. 3665a) 'the term "gross receipts from operation" as used in sec. 3664a of this Code is hereby defined to include all sums received from business done within this State'; (sec. 3666) if an assessor finds reported as operative property in his county any which he regards as nonoperative, he shall notify the Board of Equalization within thirty days; and (sec. 3607) 'nothing in this Code shall be construed to require or permit double taxation.'

"Sec. 14, article XIII (adopted 1910), was proposed by a Commission which gave the matter much consideration and made an elaborate report. It is the result of an earnest effort to provide for enforcement of adequate contributions from public service and some other corporations while avoiding double and unjust taxation. Payment of specified percentages (subject to change by the Legislature) of gross receipts was directed upon the theory that the value of operative property could be fairly measured by considering receipts therefrom. Also, that by paying to the State a portion of these, the corporation would, in effect, con-

tribute for its operative property the substantial equivalent of all taxes laid upon other property. The Commission (Rep. 1910, p. 19) said: 'In explanation of the above rates it may be stated that they are fixed on the theory that these proportions of the gross receipts will in each case equal the average burden of taxation on other classes of property. The method of arriving at the different rates is explained in detail in the 1906 report of this commission.'

"The Supreme Court of the State has declared the gross receipts tax is essentially one on property (*Pullman Company* v. *Richardson,* 185 Cal. 484, 487 [197 Pac. 346]); and it apparently approves the view that 'a fair tax upon gross earnings bore such a relation to the values of these properties under their unity of use as to justify such a tax upon revenue as being a legal and commutated or substituted tax for other taxes which were or might have been levied.' (*Pacific Gas & Electric Co.* v. *Roberts,* 168 Cal. 420, 425 [143 Pac. 700]. See *Southern Pac. Co.* v. *Levee District No. 1,* 172 Cal. 345 [156 Pac. 502]; *Great Western Power Co.* v. *City of Oakland,* 189 Cal. 649 [209 Pac. 553].)

"The State received from respondents a sum equal to five and one-half per centum of the gross revenues derived from all operative property under their control—leased as well as owned. These did not depend upon ownership; and rent paid out was not considered.

"If payment of the prescribed part of the gross receipts only relieves from local taxation property actually owned and leaves all held under lease subject thereto, inequalities with possible confiscation, would certainly result. Under that theory a corporation with title to half (in value) of its operative property, the remainder being leased, would really pay on account of the portion owned at twice the rate required of another corporation operating the same amount of property and having equal receipts, but holding nothing by lease. And if the ratio between property owned and leased were less, the difference in rate would be still greater. A telephone company which leased everything it used would release no property from taxation by paying the gross receipts tax, while a competitor with equal receipts, by paying the same amount, might absolve from local assessments property of very large value.

"These difficulties cannot be avoided by saying the lessee will not pay assessments against the lessor and therefore cannot complain. Leases are commonly made with reference to taxation. When the lessor discharges the tax the lessee pays rent accordingly. And the Fourteenth Amendment protects those within the same class against unequal taxation; all are entitled to like treatment.

"Here respondents have surrendered out of gross receipts the equivalent of the burden imposed upon other property not less valuable than all the operating property in their systems; and now, unless more is paid, disruption is threatened through seizure and sale of essential instrumentalities actually employed to produce those receipts.

"We think the purpose of the 1910 amendment is to tax all operating property of a telephone company by ascertaining the gross receipts and taking therefrom the specified percentage. Thus, the imposition becomes approximately equal to what other property bears. Unless the gross receipts tax be so treated, some very serious questions under the Federal Constitution are almost certain to arise. Without an authoritative holding by the State Supreme Court to the contrary, we must conclude the leased speaking sets are not subject to local taxation."

■ In the face of the above clear and convincing holding, it is difficult to do more than elaborate upon certain of the views therein set forth. However, we think that from another standpoint it is demonstrable that the gross earnings tax is based not only upon the value of all leased and owned operative property but also upon the added intangible values covered by such words as "franchise" or "going concern" values created by the unity of use and operation of all such properties.

The oft-quoted report of the Commission on Revenue and Taxation, 1906, which commission recommended the constitutional amendment here involved in practically the identical form in which it now appears, sets forth, after an exhaustive study of the subject, the method by which the rate of taxation on the gross earnings was arrived at, showing it to be in fact an effort to arrive at a substitute for the *ad valorem* tax upon all the properties involved in the operation of the business of the utility. After assuming the net annual receipts of the utility to be thirty-six per

cent of the gross receipts, the proper gross receipts tax is shown by the following illustration (p. 95): "In order to compute what rate of taxation on gross earnings is the equivalent of a given rate of taxation on the property, we have simply to divide the percentage of net earnings by the assumed rate of capitalization and multiply the result by whatever tax rate on the property we wish to compare the gross earnings rate with. Thus, for example, if we wish to impose, in the form of a gross earnings tax, a burden which shall be the equivalent of a tax of 1½ per cent on the property, then in the case of a railroad, taking the figures assessed above, we divide 36 by 6 or 8, whichever shall be determined upon as a fair rate at which to capitalize railroad earnings, and multiply the result by 1½, obtaining, at 6 per cent, 9 per cent as an equivalent rate on gross earnings, or at 8 per cent as a basis of capitalization, 6¾ per cent. If the tax rate on property or capital were fixed at 1 per cent, the above rates would become 6 per cent and 4½ per cent."

From this quotation it is clear that the tax is arrived at by capitalization at a fair rate of the net earnings of the utility and calculation upon this sum of a rate of taxation comparable with the average full value tax in operation upon other property in the state. It is further to be noted that net earnings as applied to the rate-fixing plan include all items paid for rent as well as interest paid upon bonded indebtedness and also items paid to cities for franchise privileges, as these several items are not deducted from the gross earnings. Referring to the exclusion of the rental charges from operating expenses, the commission used the following language (p. 96 of said report): "Some corporation officers have argued before the Commission that rent is an operating expense and should be deducted before the net earnings are computed. This rests on a fundamental misconception of the purpose of ascertaining net income. If net income is to be used to determine the rate of a tax on gross earnings, such tax to be *in lieu of all taxes on property used in operation* by a corporation, all net income accruing to that property or from its use must be included."

█ It follows, therefore, that any local assessment of taxes upon operative property is double taxation of such

property, whether it be leased or owned by the utility. If the utility owned no property and leased all its operative property, in such case there would be a complete double taxation, and such taxation is not only forbidden by the Political Code, section 3607, but in order to avoid it a special provision was also inserted (subd. 4 of sec. 3665a of said Code) to the effect that any company claiming that the levy of the percentage fixed results in double taxation of its property, may make application to the State Board of Equalization for a hearing on the matter and said board shall have the power to take evidence and determine the facts with respect to such claim and in the event the board sustains the claim of such company, said board may authorize the company to deduct from its gross receipts that amount of such receipts which, if included, would produce such double taxation.

We cannot accord weight to the argument advanced that the owner of the property and not the utility pays the tax; therefore, the utility is not concerned with the question of whether there is double taxation. If both lessor and lessee pay a full tax upon the property used by the utility, either directly or indirectly, the utility will suffer. In such a situation if it pays the tax, it will be forced to pay the same rental as a third party and thereby get no advantage from the previous tax paid upon said building by the gross receipts method. If the rental were deducted from the gross receipts and if the net earnings were thereby correspondingly reduced, the argument would have more force, but inasmuch as the question of leased or owned property does not figure in the matter of gross receipts, the tax is paid upon the property by the utility which is the equivalent of an *ad valorem* tax assessed against the owner.

The Supreme Court of Wisconsin in the case of *Merrill Ry. etc. Co.* v. *City of Merrill*, 119 Wis. 249 [96 N. W. 686], in discussing this question used the following language: "In this view it is difficult to see why leased property should not fall within the purpose of the exemption as readily as that owned absolutely, while actually used for the purposes of the enterprise. What difference would it make that his power plant had been purchased? Such fact would neither enhance nor diminish the gross earnings of the entire plant, nor the contribution thereto of this par-

ticular property. Why should the legislators care whether the dynamos in the power house or the motors on the cars were owned or leased? 'In either case they contribute equally to produce the revenue on which the license fee is graded.''

Neither can we accord importance to the contention that in making up the rate base by which the service charge to be allowed the utility is fixed, the Railroad Commission of the state refers rentals to operating expense and deducts them from the gross to arrive at the net revenues. An examination of the references to the action of this body discloses that in some instances this is done but that in other and perhaps more frequent instances, the commission allows the full value of the leased property to enter the rate base and then allows a return thereon. Whatever the method a just return to the property is the basis of action. Where the rental is a just return upon the property involved, it may be allowed and deducted as an operating expense or the leased property may be valued and used as a part of the property upon which a fair return should be allowed, in which latter case no deduction for rent is made.

The state taxing systems forbid double taxation and evidence a solicitude for the taxpayers in preventing unreasonable discrimination against any class of them. It, therefore, seems unnecessary to discuss the contention that the construction appellant offers for said amendment would contravene the guaranties found in the Fourteenth Amendment to the federal Constitution. We are mindful also of the consequences to counties in the deprivation of revenues from sources heretofore taxed by them but this loss, even if serious, is but a result of the system put in operation by the Constitution, which we are powerless to change.

The judgment is affirmed.

Richards, J., Seawell, J., and Waste, C. J., concurred.