[Civ. No. 60056. Second Dist., Div. Two. Nov. 25, 1980.]

## SOLVANG MUNICIPAL IMPROVEMENT DISTRICT, Petitioner, v. BOARD OF SUPERVISORS OF SANTA BARBARA COUNTY, Respondent.

COUNSEL

Jones, Hall, Hill & White and Robert G. Auwbrey for Petitioner.

George P. Kading, County Counsel, Robert D. Curiel, Chief Assistant County Counsel, and Paula Kimbrell, Deputy County Counsel, for Respondent.

OPINION

FLEMING, J.—Mandate. The issue is whether article XIII A of the California Constitution, which limits ad valorem taxes on real property to 1 percent of the value of the property, includes within its limitation nonvoted special assessments to pay for local improvements which directly benefit the assessed real property.

In 1968 petitioner, Solvang Municipal Improvement District (District), acting pursuant to general and special statutory authority to create public parking districts,[1] to borrow money and issue bonds to finance their cost, and to levy nonvoted special assessments against the benefited real property to service and redeem the bonds (Parking District Law of 1951, Sts. & Hy. Code, § 35100 et seq.), created a parking district and issued $610,000 of bonds to acquire three lots in Solvang for public parking purposes. The money to service and redeem the bonds was to be raised by special assessments against the benefited real property within the district, property which would be made more valuable by the increased availability of public parking. Under the statutory scheme followed by the District, voter approval to incur this indebtedness was unnecessary. Special assessments to pay principal and interest

[1]The special legislative authority is entitled Solvang Municipal Improvement District Act. (Stats. 1951, ch. 1635; effective July 23, 1951. Amended Stats. 1953, ch. 1166; Stats. 1959, ch. 1528; Stats. 1959, ch. 1728; Stats. 1963, ch. 754; Stats. 1965, ch. 240; Stats. 1965, ch. 2043; Stats. 1967, ch. 165; Stats. 1975, ch. 587.)

on the bonds were to be levied annually on benefited real property within the parking district according to assessed value and a system of zoning which increased assessed value for establishments with the most amount of traffic and the least amount of private parking. Proceeds from the levy and collection of these special assessments would be deposited in a separate bond fund for the service and redemption of the bonds. By statute the Board of Supervisors of Santa Barbara County (Board) was required to act as the District's agent for the annual levy and collection of special assessments in amounts sufficient to service and redeem the bonds. (Sts. & Hy. Code, § 35414.1.)

Rates of assessment were fixed annually by the District, and assessments were regularly levied and collected by the Board until the adoption in June 1978 of article XIII A of the Constitution. Thereafter, the Board refused to levy further assessments, because, in the Board's view, they were nonvoted special assessments which the Constitution prohibited the Board from imposing.

■ Two principal questions are presented: (1) May the Constitution retroactively deprive bondholders of their promised source of funds for repayment of moneys lent? (2) Do nonvoted special assessments for local improvements which directly benefit the property assessed come within the 1 percent limitation on ad valorem real property taxes of article XIII A?

I

The first question is easily answered.

At bench, the bondholders lent the District money to acquire parking lots on the promise that the benefited real property within the parking district would be specially assessed to create a fund to repay the debt and retire the bonds. (Sts. & Hy. Code, § 35414.) The contract (resolution) and its underlying statutory provision (Sts. & Hy. Code, § 35411) both declare that neither the District nor its officers nor its property may be held liable for repayment of the debt and retirement of the bonds. Nor are the bonds secured by any general lien on real property within the parking district. The sole security for repayment is the District's promise that special assessments will be levied on real property within the parking district. (Sts. & Hy. Code, § 35411.) Thus, the sole source of funds for repayment of moneys lent by the bondholders is the levy and collection of special assessments on the benefited real property

and the deposit of the proceeds of the assessments in a fund for service and redemption of the bonds. If the Board's argument that article XIII A precludes such assessments is correct, the bondholders have been left remediless to recover moneys lent in good faith on the strength of a duly adopted borrower's resolution authorized by statute. A clearer case of impairment of contract than removal of a creditor's sole source of security for repayment of a debt is difficult to imagine. Patently, the interpretation of article XIII A adopted by the Board amounts to a direct impairment of the obligation of contract, one which cannot survive the federal constitutional prohibition against state passage of any law impairing the obligation of contracts. (U.S. Const., art. I, § 10; *Allied Structural Steel* v. *Spannaus* (1978) 438 U.S. 234 [57 L.Ed.2d 727, 98 S.Ct. 2716]; *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1 [52 L.Ed.2d 92, 97 S.Ct. 1505]; *County of Los Angeles* v. *Rockhold* (1935) 3 Cal.2d 192 [44 P.2d 340, 100 A.L.R. 149]; *Sutter Basin Corp.* v. *Brown* (1953) 40 Cal.2d 235 [253 P.2d 649].) Article XIII A of the California Constitution most certainly cannot apply retroactively to impair the obligation of a validly executed contract entered in good faith under statutory authorization for such a contract. Clearly, the Board acted contrary to law in refusing to levy the special assessment the District asked it to make.

## II

The more difficult question is whether a nonvoted special assessment for a local improvement which directly benefits specific real property comes within the 1 percent limitation on real property ad valorem taxes established in article XIII A. The difficulty arises from an incongruity in the article's section 1, whose two subdivisions read: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective."

The incongruence in the section results from the reference in subdivision (a) to *ad valorem tax[es]* and the reference in subdivision (b) to *ad valorem taxes or special assessments.* Subdivision (a) declares that the maximum amount of ad valorem taxes on real property shall not ex-

ceed 1 percent. It says nothing about special assessments. Subdivision (b) declares that the limitation in subdivision (a) does not apply to ad valorem taxes or special assessments to pay prior voter-approved indebtedness. Unless we construe *special assessments* as being identical with *ad valorem taxes*, or unless we construe *special assessments* as a specialized form of *ad valorem taxes*, the ambiguity within the section presents us with a logical inconsistency. Subdivision (a) limits *ad valorem taxes* to 1 percent, but specifies no limitation on special assessments. Subdivision (b) purportedly creates an exception to subdivision (a) for *ad valorem taxes or special assessments* to pay prior voter-approved indebtedness. But since subdivision (a) imposes no limits on the amount of special assessments, logically, no need for a special-assessment exception in subdivision (b) exists. Both parties, therefore, undertake to rewrite section 1 through construction.

The borrowing agency, the District, seeks to construe section 1 through subtraction, by excluding as surplusage from *subdivision (b)* its reference to *special assessments*, on the argument that an exception from a limitation which has never been imposed in the first place is meaningless and should be disregarded.

The taxing agency, the Board, seeks to construe section 1 through addition, by implying a reference in *subdivision (a)* to *special assessments*, so that the 1 percent limitation of the section applies to both *ad valorem taxes* and *special assessments* on real property. Without such addition, the Board argues, the exception of voter-approved special assessments in subdivision (b) from the limitation contained in subdivision (a) becomes meaningless, and therefore, the court should construe the 1 percent limitation in subdivision (a) as applicable to both ad valorem taxes and special assessments.

Perhaps a simple illustration will clarify the logical incongruity of the section and the difficulty in reaching a harmonious solution through textual interpretation alone. Suppose a law governing compulsory military service read:

Section 1. Only 1 percent of men may be drafted into the military service.

Section 2. The 1 percent limitation does not apply to male or female civil defense workers. The Board would argue that reference to females in section 2 implies they could be drafted for civil defense under sec-

tion 1. The District would argue that lack of reference to females in section 1 implies they could not be drafted at all. To resolve such a dispute it would be necessary to consider the legislative scheme as a whole in order to select the more reasonable of two mutually exclusive constructions.

So here. The court must puzzle out the impetus and direction of section 1 of article XIII A in order to intelligently construe its text. The key to the puzzle, we believe, lies in the commonly accepted differentiation between *ad valorem tax* and *special assessment*, which the standard legal texts (14 McQuillin, Municipal Corporations (3d ed. 1970, rev.) §§ 38.01, 38.02, 38.30, 38.31; 51 Cal.Jur.3d (1979) Public Improvements, §§ 1-3, 9, 22-26; 70 Am.Jur.2d (1973) Special or Local Assessments, §§ 1-3, 9, 18-23) identify along the following lines.

■ An ad valorem tax on real property describes a general tax levy which applies a given rate to the assessed valuation of all taxable property within a particular taxing district. Such is the tax levied by a county to pay for general expenditures, such as fire and police protection, and for general improvements, such as fire stations, police stations, and public buildings, which are deemed to benefit all property owners within the taxing district, whether or not they make use of or enjoy any direct benefit from such expenditures and improvements. General ad valorem taxes also include levies to satisfy assessments of such taxing entities as municipalities, school districts, community college districts, water districts, and the like, whose activities and facilities likewise may, or may not, benefit a particular property owner. General ad valorem taxes may additionally include levies to pay the cost of deferred expenses, such as voted indebtedness of a county, a city, or a local taxing district, incurred to finance general public improvements like water filtration, sewage disposal, rapid transit, and harbor construction.

■ In contrast, a special assessment, sometimes described as a local assessment, is a charge imposed on particular real property for a local public improvement of direct benefit to that property, as for example a street improvement, lighting improvement, irrigation improvement, sewer connection, drainage improvement, or flood control improvement. The rationale of special assessment is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public. (*Burnett* v. *Mayor etc. of Sacramento*

(1859) 12 Cal. 76, 83-84.) The theory underlying special assessment is that the local improvement, such as the paving or lighting of a street, directly benefits and increases the value of adjacent real property. A special assessment may be in a fixed sum; or it may be in an amount which fluctuates with the assessed valuation of the property charged, with the expenses of the improvement, or with the use to which the assessed property is put. (*Cedars of Lebanon Hospital* v. *County of Los Angeles* (1950) 35 Cal.2d 729, 747-748 [221 P.2d 31, 15 A.L.R.2d 1045].) A fluctuating special assessment is sometimes referred to as an ad valorem special assessment. The assessment at bench qualifies as a fluctuating special assessment, in that a change in either assessed valuation of property or in the use to which particular premises are put, for example conversion of a furniture store to a restaurant, will change the amount of special assessment. Although a special assessment is imposed through the same mechanism used to finance the cost of local government, in reality it is a compulsory charge to recoup the cost of a public improvement made for the special benefit of particular property. It has been said that, strictly speaking, a special assessment is not a tax at all, but a benefit to specific real property financed through use of public credit. As the court observed in *Spring Street Co.* v. *City of Los Angeles* (1915) 170 Cal. 24, 29 [148 P. 217], "a special assessment is not, in the constitutional sense, a tax at all. It is 'a compulsory charge placed by the state upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein,...'" This view makes a clear distinction between taxes, which are levied for general revenue and for general public improvements; and special assessments, which are levied for local improvements which directly benefit specific real property.

In practical application, the two types of taxation, general ad valorem taxes and special assessments, to some extent overlap, and we cannot always differentiate between them with precision. A tax to pay the cost of a particular improvement may be crafted as a special assessment levied against particular real property within a local district on the theory that this property is the primary beneficiary of the improvement, or it may be structured as a general ad valorem tax levied on property in a larger area on the theory that all property within the larger area benefits to some extent from the improvement. Such variegated treatment may be seen in the projects of water districts, flood control districts, sewer districts, irrigation districts, and similar public entities, where the benefit of the improvement to particular property is sometimes thought to

outweigh its benefit to property in the larger area, and sometimes not. (*Los Angeles County Flood Control Dist.* v. *Hamilton* (1917) 177 Cal. 119, 124-126 [169 P. 1028]; *Roberts* v. *City of Los Angeles* (1936) 7 Cal.2d 477, 491 [61 P.2d 323]; *Harrison* v. *Board of Supervisors* (1975) 44 Cal.App.3d 852, 856-859 [118 Cal.Rptr. 828].) Yet in spite of ambiguities encountered in practice, the basic distinction between general ad valorem taxation and special assessment to meet the cost of a local improvement remains reasonably clear. (*Cedars of Lebanon Hospital* v. *County of Los Angeles* (1950) 35 Cal.2d 729, 747 [221 P.2d 31, 15 A.L.R.2d 1045], hospital exempt from taxation not exempt from special assessment; *City Street Imp. Co.* v. *Regents etc.* (1908) 153 Cal. 776, 778-79 [96 P. 801], university property, the same; *San Diego* v. *Linda Vista Irr. Dist.* (1895) 108 Cal. 189, 192-95 [41 P. 291], municipal land, the same.) In sum, a special assessment is a charge levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement. (*Burnett* v. *Mayor etc. of Sacramento* (1859) 12 Cal. 76, 83-84; *Clute* v. *Turner* (1909) 157 Cal. 73, 80 [106 P. 240]; *City of Whittier* v. *Dixon* (1944) 24 Cal.2d 664, 667-68 [151 P.2d 5, 153 A.L.R. 956], public parking.)

The distinction between the two types of levies most clearly appears in federal and state income taxation, which permit deduction from income of taxes paid to various governmental entities but not of amounts paid as special assessments. Income tax law views special assessments as capital improvements which have been financed by public agencies through use of public credit.[2]

With the differences in mind between ad valorem taxes and special assessments we return to subdivisions (a) and (b) of section 1 of article XIII A. The basic impetus behind article XIII A has been summarized by the court in *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d

---

[2]As the court said in *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 984 [156 Cal.Rptr. 777]: "Likewise, for purposes of the Personal Income Tax Law (Rev. & Tax. Code, pt. 10 (commencing with § 17001), div. 2), real property taxes, but not taxes assessed against local benefits of a kind tending to increase the value of the property assessed, are allowed as itemized deductions in computing taxable income (Rev. & Tax. Code, § 17204, subd. (a)(1), subd. (c)(6); *Northwestern etc. Co.* v. *St. Bd. Equal., supra,* 73 Cal.App.2d [548] at p. 553 [166 P.2d 917]). Such is also the case under the Internal Revenue Code of 1954 (26 U.S.C.) for federal income tax purposes (26 U.S.C.A. § 164(a)(1) and (c)(1); *Denver & Rio Grande Western Railroad Co.* v. *C. I. R.* (10th Cir. 1960) 279 F.2d 368, 370; *Brecklein* v. *Bookwalter* (W.D. Mo. 1970) 313 F.Supp. 550, 552; Ops.Cal.Legis. Counsel, No. 16240 (Nov. 13, 1978) p. 5)."

974 [156 Cal.Rptr. 777], whose conclusions on this point we adopt as our own. The court there said: "[A] major thrust of article XIII A is aimed at controlling ad valorem property taxes. This concern was stimulated by a rapid increase in property values in California over recent years. Even assuming property tax rates had remained constant, this rapid increase in market value, when reflected in increased assessed value, resulted in large property tax increases which, for the most part, had not been offset by increased income of the property owners....[¶] [T]he ballot arguments in favor of article XIII A support a conclusion that the article is aimed at *general* taxes and governmental spending....There is nothing in the ballot arguments favoring article XIII A to suggest it was intended to limit a governmental entity's ability to improve certain areas within its jurisdiction by special assessments of the property owners specially benefited. [¶] While California has never been required to consider whether statutory or constitutional limitations on general tax assessments should apply to special assessments for improvements benefiting only specific parcels of property, the handful of sister states which have interpreted such statutory or constitutional provisions have concluded that special assessments do not fall within such limitations. [Citations.] While, of course, these decisions did not involve an interpretation of the specific provisions of article XIII A, they nevertheless support a conclusion that statutory or constitutional limitations on taxes have no logical application to special assessments to finance improvements benefiting special parcels of property within the taxing jurisdiction." (Pp. 980-982.)

Nonetheless, the Board argues that the reference to *special assessments* in subdivision (b) requires that its presence be implied in subdivision (a). It then concludes that only voter-approved special assessments enjoy the exception of subdivision (b) from the 1 percent limitation on taxation established by subdivision (a). Alternatively, the Board suggests that while fixed-sum special assessments may perhaps be excluded from the 1 percent limitation on taxation in subdivision (a), ad valorem special assessments remain subject to the 1 percent limitation, and therefore nonvoted ad valorem special assessments do not qualify for the exception given to voter-approved special assessments by subdivision (b).

Faced with a standoff between two equally logical interpretations of an ambiguous law, a court will attempt to the best of its ability to seek out the underlying purpose and sense of the law, to reject a literal interpretation which would produce absurdity of result, to give the law a

practical and reasonable application, and to harmonize it with the corpus of law as a whole. (*Church of the Holy Trinity* v. *United States* (1892) 143 U.S. 457, 459, 461 [36 L.Ed. 226, 228, 12 S.Ct. 511]; *Lynch* v. *Overholser* (1962) 369 U.S. 705, 710 [8 L.Ed.2d 211, 215, 82 S.Ct. 1063].) At bench, we find two general rules of construction helpful in harmonizing the text of section 1 of article XIII A with its evident purpose. First, is the rule of surplusage, which asserts that if particular language in an enactment does not achieve any effective result, it may be declared surplus and disregarded. (*Waters-Pierce Oil Co.* v. *Deselms* (1909) 212 U.S. 159, 172-173 [53 L.Ed. 453, 460-461, 29 S.Ct. 270].) District argues that since special assessments are not covered by the limitation in subdivision (a), the specified exception in subdivision (b) is meaningless and therefore should be treated as surplusage. Second, is the rule which attributes some types of legislative ambiguity to an abundance of caution. At times a legislator may repeat himself in an attempt to make certain that a law will be construed in the manner he intends. (*Mono County* v. *Industrial Acc. Com.* (1917) 175 Cal. 752, 755 [167 P. 377].) At bench, we can hypothesize that the drafter of the amendment excluded the entire subject of special assessments from the operation of subdivision (a), but then out of abundance of caution partially repeated himself in subdivision (b) by excepting voter-approved special assessments from the 1 percent limitation of subdivision (a) to make doubly certain that such charges would be excluded from the limitation. In doing this the drafter overlooked the fact that two negatives may be read as a positive.

On the substantive merits of the controversy we think the District has the better of the argument, in that the overriding concern of article XIII A was directed against general governmental spending and general real property taxes levied to finance such spending. (*County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 985 [156 Cal.Rptr. 777].) Nothing in the history of the amendment suggests it was aimed at special assessments for local improvements to directly benefit specific real property. We view the phrase *special assessments* as an aberration which inadvertently crept into section 1. We therefore employ the foregoing two rules of construction to identify the reference to *special assessments* in subdivision (b) as surplusage, i.e. as an exception to a nonexistent limitation, and to infer its insertion by the drafter of the amendment out of an abundance of caution. ■ Accordingly, we construe the sense of section 1 as follows: (a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. . . . (b) The limitation provided

for in subdivision (a) shall not apply to ad valorem taxes to pay prior voter-approved indebtedness. Under this construction governmental entities which undertake local public improvements to benefit specified real property can finance such improvements by special assessments levied on the benefited property, without regard to the 1 percent limitation on ad valorem real property taxes specified in section 1 of article XIII A. Accordingly, the moneys needed to service the bonded indebtedness of the District's parking district may be levied and collected as special assessments not subject to the 1 percent limitation of article XIII A.

We add a word of caution to taxing entities which might be tempted to use the special assessment exclusion as a means to circumvent the tax limitation of article XIII A. Our opinion excluding special assessments, including those assessed on a fixed, variable, ad valorem, or other basis, from the 1 percent limitation of section 1 applies only to true special assessments designed to directly benefit the real property assessed and make it more valuable. (*Harrison* v. *Board of Supervisors* (1975) 44 Cal.App.3d 852, 857-858 [118 Cal.Rptr. 828], and cases there cited.) Ordinarily, levies to meet general expenses of the taxing entity and to construct facilities to serve the general public, such as fire stations, police stations, and schools, may not be transformed from general ad valorem taxes to special assessments by a mere change in the name of the levy. (Cf. *Kern County Water Agency* v. *Board of Supervisors* (1979) 96 Cal.App.3d 874, 880 [158 Cal.Rptr. 430].) In income tax matters the courts have had little difficulty distinguishing special assessments from general taxes, and we think the same will be true in the operation of article XIII A.

A writ of mandate will issue directing the Board of Supervisors of Santa Barbara County to levy and collect the special assessment sought by the Solvang Municipal Improvement District to service the bonded indebtedness of its parking district and directing the Board to levy future special assessments necessary to assure the continued servicing of this indebtedness. These special assessments may be levied outside of, and in addition to, the 1 percent limitation on real property ad valorem taxes specified in section 1 of article XIII A.

Roth, P. J., and Compton, J., concurred.