308 S.E.2d 527

**CITY OF FAIRMONT, etc.**

v.

**PITROLO
PONTIAC–CADILLAC CO., et al.**

No. CC935.

Supreme Court of Appeals of
West Virginia.

July 18, 1983.

Dissenting Opinion July 25, 1983.

Concurring Opinion Oct. 17, 1983.

Higinbotham & Higinbotham, George R. Higinbotham, Fairmont, for plaintiff.

Amos & Rodeheaver and Robert M. Amos, Fairmont, for Pitrolo Pontiac-Cadillac Co.

McKittrick & Vaughan, Dennis R. Vaughan, Jr. and Harry C. Taylor, III, St. Albans, for amicus curiae Municipal Leagues.

Jackson, Kelly, Holt & O'Farrell, Thomas N. Chambers and Jennie Ovrom Ferritti, Robert R. Harpold, Jr., City Atty., Charleston, for amicus curiae City of Charleston.

John L. DePolo, City Atty., Clarksburg, for amicus curiae City of Clarksburg.

MILLER, Justice:

The issues in this certified case arose when the City of Fairmont filed suit against Pitrolo Pontiac-Cadillac and Acme Land Company to collect delinquent fire service fees. The defendants sought to defeat the collection by claiming that the City fire service charge was an ad valorem tax and violated the provisions of Section 1 of Article X of the Constitution of West Virginia. While this case was pending in the circuit court, we issued our opinion in *Hare v. City of Wheeling*, 171 W.Va. 284, 298 S.E.2d 820 (1982), where we said in its single Syllabus:

> "Where certain ordinances of the City of Wheeling impose upon owners of property a police service charge based upon the value of property, as determined from the land books and personal property books of the Ohio County Assessor, such ordinances impose, in fact, an *ad valorem* tax upon property, and where, without regard to the police service charge, property within the City of Wheeling is taxed to the maximum amount permitted under *W.Va. Const.*, art. X, § 1, known as the 'Tax Limitation Amendment,' and *W.Va. Code*, 11–8–6d [1949], such ordinances violate that constitutional provision."

The circuit court held that the ordinance was unconstitutional under *Hare.* It also concluded that the ruling in *Hare* was applicable as against the City's argument that *Hare* should not be made applicable to delinquent taxes accruing prior to the date of the *Hare* opinion. We agree with the circuit court's decision on both issues.

There is no argument that the maximum levy provisions of Section 1 of Article X relate to ad valorem taxes on real and personal property.[1] *Hare, supra; Appala-*

---

1. The maximum tax limitations contained in Section 1 of Article X are:

chian Power Company v. The County Court of Mercer County, 146 W.Va. 118, 118 S.E.2d 531 (1961); Bee v. City of Huntington, 114 W.Va. 40, 171 S.E. 539 (1933); Finlayson v. City of Shinnston, 113 W.Va. 434, 168 S.E. 479 (1933).

We are asked to distinguish the *Hare* case by characterizing the tax in this case as a service fee rather than a property tax. The City argues that *Hare* did not recognize the distinction between a service fee and a property tax. Because W.Va.Code, 8–13–13, authorizes imposition of fees for municipal services, the City claims that its fire service charge should be sustained as a fee and not as a property tax. Furthermore, the City suggests that there are differences between a fee and a property tax. First, a fee is usually imposed for some specific purpose, and in the present case it is for fire protection. Second, a property tax ordinarily creates a lien and is not enforceable against the taxpayer personally; whereas, a fee does not create a lien and may be enforced personally.

■ This issue of property tax versus service fee was raised in *Hare*, although not as extensively argued, and we stated: "The issue before this Court, therefore, is whether the police service charge promulgated by the City of Wheeling was a fee not precluded by the Tax Limitation Amendment, or whether the police service charge was, in fact, an *ad valorem* tax

upon property enacted in violation of the Tax Limitation Amendment." 171 W.Va. at 288, 298 S.E.2d at 825. We then proceeded to cite *Dawson v. Kentucky Distilleries & Warehouse Co.*, 255 U.S. 288, 41 S.Ct. 272, 65 L.Ed. 638 (1921),[2] and *Hukle v. City of Huntington*, 134 W.Va. 249, 58 S.E.2d 780 (1950), to the effect that the character of a tax is determined not by its label but by analyzing its operation and effect, and concluded:

"It is without question that the police service charge in this action is, in fact, an *ad valorem* tax upon property. The ordinances were imposed upon the owners of property within the City of Wheeling, and the amount to be collected was directly related to the assessed value of that property. Pursuant to Ordinance No. 7278, the value of property for purposes of the ordinances was to be determined from the land books and personal property books of the Ohio County Assessor." 171 W.Va. at 290, 298 S.E.2d at 826.

■ When we turn to the pertinent provisions of the City of Fairmont Ordinance No. 524, we believe that the tax is an ad valorem tax and not a service fee. Section 2 of the ordinance imposes and assesses on all residential, commercial, industrial, or other buildings within the city, the amount of fifty-five cents per one hundred dollars of the value of such buildings.[3] This sec-

"[T]he aggregate of taxes assessed in any one year upon personal property ... shall not exceed fifty cents on each one hundred dollars of value thereon and upon all property owned, used and occupied by the owner thereof exclusively for residential purposes and upon farms occupied and cultivated by their owners or bona fide tenants one dollar; and upon all other property situated outside of municipalities, one dollar and fifty cents; and upon all other such property situated within municipalities, two dollars."

2. *Dawson v. Kentucky Distilleries & Warehouse Co., supra,* is relied on in the present case by the City but, if anything, it seems opposite to the City's position. The tax in *Dawson* was "50 cents a gallon upon all whiskey either withdrawn from bond or transferred in bond from Kentucky to a point outside that State." 255 U.S. at 289, 41 S.Ct. at 273, 65 L.Ed. at 644. Justice Brandeis, speaking for a unanimous court, concluded that it was a property tax since "[t]o levy a tax by reason of ownership of prop-

erty is to tax the property." 255 U.S. at 294, 41 S.Ct. at 275, 65 L.Ed. at 646.

3. The complete text of Section 2 is:
"LEVIED: There is hereby imposed and assessed upon the respective owner of all residential, commercial, industrial or other buildings of every kind and nature regardless of the type or types of construction, situate within the City, the amount of Fifty-Five Cents ($.55) per One Hundred Dollars of the value of such residential, commercial, industrial or other buildings, the value being that as fixed for tax purposes by the Assessor of the County, or by the Board of Public Works of the State, and where no value has been fixed then the value shall be determined and fixed by the Finance Director. In order to determine such value when no value has been fixed for tax purposes as aforesaid, the Finance Director may make or cause to be made such reports, investigations and surveys as may be requisite.

tion also prescribes the same rate of tax for all tangible personal property, goods, and chattels. The value according to the ordinance is "that as fixed for tax purposes by the Assessor of the County, or by the Board of Public Works of the State." [4]

Under Section 3 of the ordinance the tax is collected in two semiannual installments.[5] The first is due, and payable on October 1 and the second on April 1 of each year.[6] This section further states that the tax "shall be collected in the same manner as municipal taxes are collected under the statutes of the State by the Sheriff of the County." [7]

The distinction between an ad valorem tax and other taxes has been discussed in a number of cases. *In re City of Enid,* 195 Okl. 365, 158 P.2d 348 (1945), contains a lengthy review of various authorities which have considered the question and the court concluded:

> "In the early case of *Society for Savings v. Coite,* 73 U.S. 594, 6 Wall. 594, 18 L.Ed. 897, it was pointed out that whenever a property tax was imposed by law, provision was made that the value of the

property be ascertained by appraisement and that the tax be assessed upon the appraised value of the property. The essential difference between an ad valorem tax and any form of privilege tax is that the ad valorem property tax is based upon the value of the property, tangible or intangible. *Pacific Gas & Electric Co. v. Roberts,* 168 Cal. 420, 143 P. 700. See, also, *Commonwealth v. Columbia Gas & Electric Corporation,* 336 Pa. 209, 8 A.2d 404, 131 A.L.R. 927. Other authorities to the same tenor and effect as those hereinabove cited are collected in the following annotations: 89 A.L.R. 1432, 110 A.L.R. 1485, 117 A.L.R. 847, 128 A.L.R. 894, 103 A.L.R. 93. See, also, 26 R.C.L., sec. 19, p. 35; 33 C.J.S., Excise, p. 110." 195 Okl. at 369, 158 P.2d at 352.

In *Callaway v. City of Overland Park,* 211 Kan. 646, 651, 508 P.2d 902, 907 (1973), the court made this distinction:

> "The term 'excise tax' has come to mean and include practically any tax which is not an *ad valorem* tax. *An ad*

---

"There is hereby imposed and assessed upon the respective owners of all tangible personal property, goods and chattels located within the City, the amount of Fifty-Five Cents ($.55) per One Hundred Dollars of the value of such personal property, as aforesaid, the value being that as fixed for tax purposes by the Assessor of the County, or by the Board of Public Works of the State, and where no such value has been fixed then the value shall be determined and fixed by the Finance Director, In order to determine such value when no value has been fixed for tax purposes as aforesaid, the Finance Director may make or cause to be made such reports, investigation and surveys as may be requisite."

The language in this section is essentially the same as contained in the original Ordinance No. 221, except that as to the amount of the tax which has been increased by amendments from an original twenty cents per one hundred dollars of value to the fifty-five cents per one hundred dollar value.

4. Under the state property tax provisions, county assessors set the value of all real and personal property. W.Va.Code, 11–3–1. *See generally Killen v. Logan County Commission,* W.Va., 295 S.E.2d 689 (1982). The property of public service corporations is valued by the Board of Public Works. W.Va.Code, 11–6–11.

5. The complete text of Section 3 is:

"COLLECTIONS: The rate and fees levied and assessed by this Ordinance shall be collected from each user in two semi-annual installments; the first of such installments being due and payable on October 1st of each year and a like installment being due and payable on April 1st of each year. Such rates, fees and rentals imposed, levied and assessed pursuant to this Ordinance shall be collected in the same manner as municipal taxes of the City are collected under the statutes of the State by the Sheriff of the County, provided that the City shall reimburse and pay such Sheriff for the costs of such collections so made; provided further, however, that such rates, fees and rentals as are levied and imposed against property otherwise exempt from taxation, or otherwise not collected by said Sheriff, shall be collected by the City Treasurer."

6. Under the State property tax statutes, real and personal property taxes are payable semi-annually by October 1 and April 1 or they become delinquent. W.Va.Code, 11A–1–13.

7. Under the provisions of W.Va.Code, 11A–1–4, sheriffs of each county are authorized to collect State imposed real and personal property taxes and they must remit the municipalities' shares under W.Va.Code, 11A–1–15.

*valorem tax is a tax imposed on the basis of the value of the article or thing taxed.* An excise tax is a tax imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege. (See 15A Words and Phrases, p. 150.)" (Emphasis added)

The Maryland Supreme Court used this general definition of a property tax in *Weaver v. Prince George's County,* 281 Md. 349, 357–58, 379 A.2d 399, 403–04 (1977):

"The consensus of opinion appears to be that a property tax is a charge on the owner of property by reason of his ownership alone without regard to any use that might be made of it, *Bromley v. McCaughn,* 280 U.S. 124, 136, 50 S.Ct. 46 [47], 74 L.Ed. 226 (1929); *Dawson v. Kentucky Distilleries Co.,* 255 U.S. 288, 294, 41 S.Ct. 272 [275], 65 L.Ed. 638 (1921); *Flint v. Stone Tracy Co.,* 220 U.S. 107, 152, 31 S.Ct. 342 [349], 55 L.Ed. 389 (1911); *Herman v. M. & C.C. of Baltimore,* 189 Md. [191] at 197, 55 A.2d 491; ...

\*  \*  \*  \*  \*  \*

"Finally, the property tax and the excise tax may be differentiated by the methods used to impose them and to fix their amount. Thus, it has been held that where a tax is levied directly by the Legislature without assessment and is measured by the extent to which a privilege is exercised by a taxpayer without regard to the nature or value of his assets, it is an excise. Where, however, the tax is computed upon a valuation of the property and is assessed by assessors, and where the failure to pay the tax results in a lien against the property, it is a property tax, even though a privilege might be included in the valuation. *Montgomery County, Maryland v. Ma-*

*ryland Soft Drink Association, Inc.,* 281 Md. 116, 127–28, 377 A.2d 486 (1977); *Walker v. Bedford,* 93 Colo. 400, 26 P.2d 1051, 1053 (1933); *City of De Land v. Florida Public Service Co.,* 119 Fla. 804, 161 So. 735, 738 (1935). *See Society for Savings v. Coite,* 73 U.S. (6 Wall) 594, 610, 18 L.Ed. 897 (1868)."

*See also Solvang Municipal Improvement District v. Board of Supervisors of Santa Barbara County,* 112 Cal.App.3d 545, 169 Cal.Rptr. 391 (1980); *Gulf Fertilizer Co. v. Walden,* 163 So.2d 269 (Fla.1964); *Continental Illinois National Bank and Trust Company of Chicago v. Zagel,* 78 Ill.2d 387, 36 Ill.Dec. 650, 401 N.E.2d 491 (1979); *Thomas v. City of Elizabethtown,* 403 S.W.2d 269 (Ky.1966); *Joslin v. Regan,* 63 A.D.2d 466, 406 N.Y.S.2d 938 (1978), *aff'd,* 48 N.Y.2d 746, 422 N.Y.S.2d 662, 397 N.E.2d 1329 (1979); 71 Am.Jur.2d *State and Local Taxation* § 20 (1973).

Analyzing the ordinance, it is apparent that it closely resembles the general State ad valorem property tax for real and personal property. The City utilizes the assessments made by the county assessor and the State Board of Public Works for the general property tax to determine the value of the property subject to the City's tax. The tax payments are required to be made semiannually and the due dates are the same as the State property tax. The sheriff is empowered to collect the City tax, the same as the State tax. The rate of tax is fifty-five cents for each one hundred dollars of value which is based on the traditional ad valorem property tax concept, the value of the property. The only difference is that under the State act a lien is imposed on real property for the taxes assessed. W.Va.Code, 11A–1–2. A State statute [8] provides as does the ordinance [9] that delin-

---

**8.** W.Va.Code, 11A–2–2, provides:

"Taxes are hereby declared to be debts owing by the taxpayer, for which he shall be personally liable. After delinquency, the sheriff may enforce this liability by appropriate action in any court of competent jurisdiction. No such action shall be brought after five years from the time the action accrued."

**9.** Section 13 of the ordinance states:

"PENALTIES, DISCOUNT: The rates and fees assessed pursuant to the provisions of this Ordinance shall be a debt due the City and may be collected by proceedings instituted in courts of appropriate jurisdiction, or in such manner as provided by West Virginia Code 8–13–15. A penalty of ten per cent (10%) of the rate or fee shall be added for any default for a period of thirty (30) days or less in payment of such rate or fee, and for each

quent taxes are debts that may be sued upon.

■ We do not view the absence of a provision for a lien right in the ordinance to be controlling in identifying whether the ordinance is a property tax. Nor do we believe that a critical distinction can be made over the fact that only buildings are assessed under the ordinance rather than the entire fee. The essential characteristic of an ad valorem tax, as its name suggests, is that the tax is levied according to the value of the property. Also, assessment on a regular basis is a common characteristic. How or who determines the value of the property is not a critical element in analyzing whether the tax is an ad valorem tax.

■ The City argues that property owners having buildings are the logical class of users of fire protection and, therefore, the charge being based on the value of their buildings is an eminently fair way of apportioning it for fire service. We have no quarrel with this abstract proposition. If we were dealing with an apportionment issue, the argument would make good sense. The issue here, however, is not one of apportionment.[10] This case involves the question of whether our constitutional limitation on maximum rates for ad valorem

property taxes has been exceeded. As in the *Hare* case, it is admitted that the City is already at the maximum levy rate authorized by W.Va.Code, 11–8–6d, which is the statute allocating to municipalities their maximum share of the levy rates established in Section 1 of Article X of our Constitution.[11] Consequently, we are compelled to conclude that no matter how fairly apportioned an ad valorem property tax may be, if its amount exceeds the constitutional levy limits prescribed by Section 1 of Article X of the Constitution of West Virginia, it is void.[12]

An argument is also made that the *Hare* decision, involving as it did a police service fee, can be distinguished from the fire service charge in the present case by following *McCoy v. City of Sistersville*, 120 W.Va. 471, 199 S.E. 260 (1938). In note 7 of *Hare*, we discussed *McCoy* and several related cases and began by stating: "Prior decisions of this Court have not directly addressed the validity of a municipal ordinance, promulgated pursuant to *W.Va. Code*, 8–13–13 [1971], in terms of whether such ordinance constituted an *ad valorem* tax upon property in excess of the limitations established by the Tax Limitation Amendment." 171 W.Va. at 288, 298 S.E.2d at 825.

succeeding thirty (30) days elapsing thereafter before payment there shall be an additional penalty of one and one-half percent (1½%). Provided, that a discount of two and one-half percent (2½%) shall be allowed on the first semiannual installment payment due April 1st if paid thirty (30) days prior to the said date each year, and a like discount of two and one-half per cent (2½%) shall be allowed on the second semiannual installment payment due October 1st if paid thirty (30) days prior to the said date each year."

10. This was the issue in *City of Moundsville v. Steele*, 152 W.Va. 465, 164 S.E.2d 430 (1968), where we upheld under W.Va.Code, 8–13–13, a paving fee based on a lineal front foot assessment against the claim that it violated the uniformity provisions of Section 9 of Article X of the Constitution of West Virginia. Such an assessment not being based on value would not violate Section 1 of Article X.

11. In *Hare v. City of Wheeling*, 171 W.Va. at 288, 298 S.E.2d at 824, we said:
"In response to the Tax Limitation Amendment [Section 1 of Article X], the West Virgi-

nia Legislature enacted *W.Va.Code*, 11–8–1, *et seq.* The purpose of that article is generally to provide the maximum rates, within the restrictions of the Tax Limitation Amendment, for levies which may be laid upon property by the various taxing units of the State. Taxing units are defined in *W.Va.Code*, 11–8–4 [1933], municipalities constituting one such unit. Property is classified for levy purposes by *W.Va.Code*, 11–8–5 [1961], and the aggregate of taxes imposed upon the different property classifications by the taxing units is established by *W.Va.Code*, 11–8–6 [1939]. The specific levies permitted to be imposed by each taxing unit, such levies to be within the aggregate levy, is provided by *W.Va.Code*, 11–8–6a through *W.Va.Code*, 11–8–7. The maximum levy which may be imposed by municipalities is provided by *W.Va.Code*, 11–8–6d [1949]." (Footnotes omitted)

12. Although not an issue here, we recognize that Section 1 of Article X provides for 50% excess levies and that other constitutional provisions also have an impact on the maximum levy rates. W.Va. Const. art. X, §§ 7, 8 & 10.

The primary issue in *McCoy* involved the constitutionality of certain municipal fees including a fire service charge under Section 9 of Article X of our Constitution which requires that municipal statutes shall be uniform.[13] Most of the ordinance was declared unconstitutional. The fire service charge was held constitutional because the Court found it to be uniform since "the owners of the buildings and chattels may be fairly said to be users of the services provided for their protection." 120 W.Va. at 478, 199 S.E. at 263. The Court's discussion of the impact of Section 1 of Article X was at best ambiguous: "If the assessed value were used, and the fee assessed, a serious question would have been raised as to a violation of the limitation amendment." 120 W.Va. at 478, 199 S.E. at 263.[14]

█ The argument that *McCoy* can be read to sanction an ad valorem tax on buildings to support a charge for fire services under W.Va.Code, 8–13–13, is unfounded. There can be no question that buildings affixed to the land are a part of the realty and, therefore, can be taxed as real property. *Mr. Klean Car Wash, Inc. v. Ritchie*, 161 W.Va. 615, 244 S.E.2d 553 (1978); *State Road Commission v. Curry*, 155 W.Va. 819, 187 S.E.2d 632 (1974); *see also Whited v. Louisiana Tax Commission*, 178 La. 877, 152 So. 552 (1934). Even in those situations where structures are deemed fixtures, they constitute personal property and are still taxable. *Blair v. Freeburn Coal Corporation*, 163 W.Va. 23, 253 S.E.2d 547 (1979). The ultimate

fact still remains that if the owners of property are required to pay the government a sum based upon the value of the property, this is an ad valorem tax. Once an ad valorem tax is found to exist under a municipal ordinance and the municipality is already at the maximum ad valorem rates prescribed by law, such additional ad valorem tax violates Section 1 of Article X of our Constitution.

Finally, the City argues that we should hold that *Hare* is prospective only thus enabling the City to collect delinquent fire service fees that have accrued before the date of the *Hare* decision. This we decline to do since the circuit court in the present case found the City's ordinance to be unconstitutional under *Hare*—a finding that we have confirmed. We have utilized principles of retroactivity in certain cases when we have created new principles of law which have marked a clear departure from our prior law. *E.g., LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312 (1983); *Sitzes v. Anchor Motor Freight, Inc.*, 169 W.Va. 698, 289 S.E.2d 679 (1982); *Bond v. City of Huntington*, 166 W.Va. 581, 276 S.E.2d 539 (1981); *Ables v. Mooney*, 164 W.Va. 19, 264 S.E.2d 424 (1979); *Bradley v. Appalachian Power Company*, 163 W.Va. 332, 256 S.E.2d 879 (1979). These new legal principles have resulted in the main from this Court's traditional power to create and modify common law principles. We have pointed out that this is a power traditionally exercised by other appellate courts. *See Morningstar v. Black and Decker Manufacturing Company, Inc.*, 162 W.Va. 857, 253 S.E.2d 666 (1979).

---

13. Section 9 of Article X states:

"The legislature may, by law, authorize the corporate authorities of cities, towns and villages, for corporate purposes, to assess and collect taxes; but such taxes shall be uniform, with respect to persons and property within the jurisdiction of the authority imposing the same."

14. The full text on this issue from *McCoy* is:

"The ordinance as to fire protection provides for an assessment on buildings and chattels. Giving to the statute, and the ordinance adopted thereunder, a liberal construction, the owners of the buildings and chattels may fairly be said to be the users of the services provided for their protection. True, these as-

sessments are based on the value of the buildings and chattels, but no reference is made to the assessed values on which levies are laid, nor is the entire value of real estate in particular made the basis of the assessment, but only the buildings located thereon. If the assessed value were used, and the fee assessed, a serious question would have been raised as to a violation of the limitation amendment, and as the matter stands, the validity of the assessment as to personal property remains in doubt, the only saving feature being that the assessment as to this class of property is not based on the assessed value for tax purposes. On the whole, we conclude and hold that the proposed ordinance as applied to fire protection should be upheld." 120 W.Va. at 478, 199 S.E. at 263.

■ However, where a statute or an ordinance is declared unconstitutional, a different rule applies. It is generally held that when a statute or ordinance is declared unconstitutional, it is inoperative, as if it had never been passed. *E.g.*, *Shirley v. Getty Oil Company*, 367 So.2d 1388 (Ala.1979); *Kozlowski v. Kozlowski*, 80 N.J. 378, 403 A.2d 902 (1979); *Stanton v. Lloyd Hammond Produce Farms*, 400 Mich. 135, 253 N.W.2d 114 (1977); *Sadler v. Connolly*, 175 Mont. 484, 575 P.2d 51 (1978); 16 Am.Jur.2d *Constitutional Law* § 256 (1979). In *Morton v. Godfrey L. Cabot, Inc.*, 134 W.Va. 55, 63 S.E.2d 861 (1949), we recognized this rule in Syllabus Point 2, which was based on *Norton v. Shelby County*, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886). In *Morton v. Godfrey L. Cabot, Inc.*, *supra*, we also recognized the qualification to this absolute rule as set out in *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 374, 60 S.Ct. 317, 318, 84 L.Ed. 329, 332–33 (1940), where the United States Supreme Court stated: "It is quite clear, however, that such broad statements as to the effect of the determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored."

■ In the present case, we conclude that the City may not proceed to collect delinquent fire service taxes because its ordinance has been found to be unconstitutional.[15]

■ Although we have concluded that the City may not pursue delinquent fire service taxes accruing before the date of *Hare*, this does not mean that the City is liable to the taxpayers for taxes paid pursuant to the ordinance which has been found to be unconstitutional. The general rule is that, ordinarily, in the absence of any statutory right permitting recovery, a voluntary payment of a tax made under a statute which is later declared unconstitutional cannot be recovered.[16] *E.g.*, *Little v. Bowers*, 134 U.S. 547, 10 S.Ct. 620, 33 L.Ed. 1016 (1890); *Berry v. Daigle*, 322 A.2d 320 (Me.1974); *State v. Silas*, 92 N.M. 434, 589 P.2d 674 (1979); *Coca-Cola Company v. Coble*, 33 N.C.App. 124, 234 S.E.2d 477 (1977), *cert. granted*, 293 N.C. 159, 236 S.E.2d 703, *aff'd*, 293 N.C. 565, 238 S.E.2d 780; *Stroop v. Rutherford County*, 567 S.W.2d 753 (Tenn.1978); *National Biscuit Co. v. State*, 134 Tex. 293, 135 S.W.2d 687 (1940); 72 Am.Jur.2d *State and Local Taxation* § 1087 (1974).

We, therefore, affirm the circuit court's rulings on the certified questions to the effect that the ordinance is unconstitutional and that the City may not seek to collect its delinquent fire service charges.

Rulings on Certified Questions Affirmed.

NEELY, Justice dissenting:

This is preeminently a case requiring the application of *stare decisis*. This case should be controlled by *McCoy v. Sistersville*, 120 W.Va. 471, 199 S.E. 260 (1938). In that case, we held the following: (1) the provision of the *W.Va.Code* (now *Code*, 8–13–13 [1971]) that allows cities to make separate charges for specific, enumerated services is constitutional; (2) cities may charge for fire protection under the authority of what is now *Code*, 8–13–13 [1971] on the basis of use; and (3) fees based on the value of improvements and personal property bear such a reasonable correlation to the actual use of fire protection that they

**15.** In *Blankenship v. Minton Chevrolet, Inc.*, 164 W.Va. 446, 266 S.E.2d 902 (1979), we dealt with a somewhat related problem, the enforceability of judgments rendered by justices of the peace prior to our decision in *State ex rel. Shrewsbury v. Poteet*, 157 W.Va. 540, 202 S.E.2d 628 (1974). In *State ex rel. Shrewsbury v. Poteet*, *supra*, we had held that justice of the peace fee system created a pecuniary interest in justice. We held in *Blankenship v. Minton Chevrolet, Inc.*, *supra*, that the judgments entered prior to the date of *State ex rel. Shrewsbury v. Poteet*, *supra*, were not void *ab initio* but voidable. In the present case, it is not prior judgments obtained by the City which are at issue, but its right to continue to prosecute and collect delinquent fire service taxes accruing prior to the date of the *Hare* opinion.

**16.** We are aware of no statute in this State authorizing recovery for payment of municipal taxes under an unconstitutional ordinance.

are an appropriate basis on which to assess a user fee.[1]

Nothing has changed since *McCoy* was decided. Neither the statute nor the *Constitution* has been amended in any way relevant to this issue. Furthermore, the case of *Hare v. City of Wheeling*, 171 W.Va. 284, 298 S.E.2d 820 (1982) does not conflict with *McCoy, supra,* and does not mandate or even imply the result we have reached today. In *Hare,* as in *McCoy,* we held that a user fee based on a property value that bears no correlation to actual use is unconstitutional as an *ad valorem* tax. In *McCoy,* we struck the fee for street lighting tied to property values for exactly the same reason that we struck the fee for police protection tied to property values in *Hare.* In neither instance was there any correlation between the value of one's property and the use of the service.

Fire protection is very different from street lighting or police service. Police services are largely directed to the protection of human life and the preservation of order. Fire service is directed to the protection of property. It follows, therefore, that while police service is often most needed in lower income areas where violence is prevalent, fire protection is most needed by those who have significant property interests to protect. Furthermore, the owners of improved property enjoy a direct cash benefit in the form of reduced fire insurance rates in a municipality with efficient fire protection.

The Fairmont ordinance is carefully drawn to reflect this reality. The fire protection assessment is not based simply on the total value of property; rather it is based on the value of buildings, other improvements and personal property. There is no correlation between the ownership of land *per se* and the need for fire protection; but there is an almost perfect correlation between ownership of buildings and personal property and the use of fire protection services.[2] Of course, other variables effect the use of a fire department as well. Those who smoke in bed are more likely to be consumers of fire service; but it would require an intrusive government indeed to be able to base assessment of a user fee on evidence of such negligence. Government is the art of the possible, and the Fairmont ordinance does as much as is possible rationally to allocate fees for fire protection according to use.

Despite the rationality of the Fairmont ordinance, the majority now strike it down because they choose to label the assessment an *ad valorem* tax rather than a user fee. Since Fairmont property is already taxed to the constitutional limit set by *W.Va. Const.,* art. 10 § 1, they argue that any additional assessment is unconstitutional. Brief examination shows this particular ruling to be seriously flawed.

The reason is simple. The majority opinion goes to considerable lengths to demonstrate that an assessment based on value is *ad valorem.* One need not be a Latin scholar to agree. Although Fairmont's ordinance envisages an *ad valorem* system, it does not mandate a tax. "[A] tax is a pecuniary burden laid upon individuals, or, property, *to support the government.*" In *re Mytinger,* 31 F.Supp. 977 (N.D.Texas, 1940). (Emphasis added). (How's that for citing a little obscure, out-of-state precedent?) Any tax is money raised by the government for general governmental purposes regardless of whether the taxing statute "dedicates" the tax to a particular purpose. A fee differs from a tax not in its method of collection, but in the perfect correlation between use of government service and payment for the service.

Fairmont is not taxing property value. It is simply using property value as an

1. We reaffirmed the constitutionality of the fire service fee in *City of Charleston v. Board of Education,* 158 W.Va. 141, 209 S.E.2d 55 (1974) in which we held that a "fee for service and protection is not a tax." (Syllabus). That case is also noteworthy because it upheld charging the service fee to the Board of Education despite its *tax* exempt status.

2. "Use" is a term of art here. I do not mean to imply that owners of valuable property have more fires. They "use" the existence of fire protection to obtain lower insurance premiums and to free assets which would otherwise have to be held in reserve to protect against the possibility of a destructive blaze. Because their original stake is larger, their use is greater.

accurate indirect measurement of the use of fire protection by members of that community. If individuals who paid the fire service fee could show that in fact some of the funds collected under that ordinance were used to support other public purposes —schools, police, street lights—then they could quite correctly argue the fee is an *ad valorem* tax in excess of the constitutional limit. Without such evidence, they are only arguing that fees charged for use are based on the value of what the fire department protects. Presumably, a private system of fire protection would also charge fees based on the value of what is protected. The only alternative would be to charge users a few thousand dollars every time they dial the local fire station. The absurdity of that approach serves to underline the rationality of the Fairmont ordinance.

No compelling public purpose is served by overruling *McCoy, supra.* In fact, this decision is certain to make a bad situation worse. Cities are being squeezed on all sides. At the same time that money from Washington is being cut, costs are rising and demands for services are increasing. The money to pay for municipal services will need to come from somewhere and the alternatives to the fire service fee are not overwhelmingly attractive. Is there a greater correlation between use of fire protection services and one's taxable income (the income tax option) or the volume of total purchases (the sales tax option) than there is to one's ownership of property? Is the current tax more regressive than alternatives? Do thousands of poor people own acres of valuable, improved municipal property while the rich escape the tax by living in hovels? The answers to all of these questions militate in favor of retaining the fire service fee.

It is amusing for a moment to contemplate some alternative means of assessing a user fee. If it is done on the basis of total square footage, then the owner of an entirely valueless but large warehouse pays more than the owner of a small jewelry store with a million dollar inventory. If the fee is assessed by frontage foot, then the owner of a long, low building pays more than the owner of a tall, skinny building. Furthermore, the raising of equal revenue by any other means of assessment siphons money away from the provision of services to costs related to the collection of the fee. Who measures square footage or front footage? If it is the taxpayer, who audits the results? Now all the administrative costs are borne by the assessor whose marginal costs for passing information to the city is negligible. And if the current user-based revenue source is replaced by an income tax, then we shall pay double the current fire protection fee: we shall still pay the City what we are paying now. Most of us, however, will also pay again as much in time and inconvenience when we fill out yet one more complicated form.

Most importantly, the structure of West Virginia taxation is predicated on the validity of the fire service fee. Municipalities are greatly limited in how they can tax.[3] If this fire service fee option is removed, some alternative must be made available so that vital services can continue. Until our legislature convenes next January the cities will be left without their expected revenue, but must presumably continue to provide necessary services. That will be no mean feat and the majority opinion is notably silent on exactly how this legerdemain is to be accomplished.

Today's surprising decision disturbs legitimate expectations. It tells local elected officials that the way they have been going about their business is not good enough; but it does not spell out the progressive reform that will lead to a better world for all of us. I am reminded in this regard of the chap who took the handlebars from the front of his bicycle and placed them over the rear wheel; he achieved change without effecting improvement. Perhaps such intellectual curiosity is to be welcomed in graduate students; but caution is a more

---

**3.** A municipality can levy taxes only by virtue of authority delegated to it by the legislature. *Fairmont v. Bishop,* 69 W.Va. 308, 69 S.E. 802 (1910). The limited powers of municipal corporations to tax are codified at the *Code,* 8–13–1 to 23 [1983].

necessary trait in the judiciary. Today's decision is more notable for its sense of adventure than for its logic or consistency.

McGRAW, Chief Justice, concurring:

The controversy in the present case superficially concerns whether the charge levied by the City of Fairmont for fire protection is a fee or a property tax. In reality, however, the larger question is whether the Court should label such charges "fees" in order to avoid the constitutional restrictions placed by the people on the imposition of property taxes.

Any analysis of the relationship between state or local government and its citizenry in West Virginia must begin with art. II, § 2 of the West Virginia Constitution, which provides, "The powers of government reside in all the citizens of the State, and can be rightfully exercised only in accordance with their will and appointment." In *State ex rel. Skinner v. Dostert*, 166 W.Va. 743, 278 S.E.2d 624, 629 (1981), the Court discussed the important historical shift in the theory of government which was precipitated by the great American experiment in democracy: "The American constitutional system, under which West Virginia's government is organized, W.Va. Const. art. 1, § 1, changed substantially the operative theory of sovereignty and identified the sovereign, whose will legitimizes authority, as the people."

In exercising that sovereign authority, the people of West Virginia, through the Tax Limitation Amendment of 1932, W.Va. Const. art. X, § 1, acted to confine government spending within what was perceived to be reasonable limits. Although there existed a strong belief that essential governmental services should still be provided, the will of the people was that services should be sacrificed when governmental expenditures reached a certain level deemed intolerable. The challenge for government became to provide essential services within these constitutionally mandated limits. Essential local governmental services included provision for the public safety and general welfare—police and fire protection; waste disposal—solid and liquid; and streets. The mandate of the people was that these essential services should be provided first, with other types of nonessential services being provided only if surplus revenues were available. This required that priorities be established to ensure that essential services be provided at the lowest possible cost to the taxpayer.

Government, however, failed to rise to the occasion and sought to avoid its constitutional responsibilities. The strategy which evolved was to utilize tax dollars properly meant for the provision of essential services to fund nonessential services. Commenting upon this expansion in local government, one leading authority has noted,

The rapid development of community service and the steady expansion of municipal functions ... has rendered the equitable raising and distribution of funds for public purposes of prime importance. The financial problem ... is among the most serious. As the activities of the city grow the cost of municipal service rapidly advances. Many things essential to urban life, which were formerly in private hands, are now being gradually socialized, and as a result are becoming customary municipal functions. City expenditures expand far beyond the increase of the community in wealth and population .... Continuously increasing pressure for more and better community service ... and the increase of city officers and servants and bureaucratic complications entailed by it, have involved great and increasingly greater expenditures. Hence fresh sources of revenue must be found.

E. McQUILLEN, THE LAW OF MUNICIPAL CORPORATIONS § 39.02 at 3–4 (1970).

After diverting tax revenues into these new areas of governmental endeavor, government began *charging* its citizenry "fees" for the provision of traditional essential services. By attempting to call a spade a shovel, political leaders, pressed by the demands of diverse constituency groups within local governmental entities, have sought to avoid the will of the people

that the growth of government be limited. Ironically, it was many of these same political leaders who helped spur passage of the Property Tax Limitation [Amendment] of 1982, W.Va. Const. art. X, § 1b, which further constrained the ability of local governments in West Virginia to raise revenue. To wiggle off the sharp hook which they have fashioned for themselves, these political leaders now turn to the Court and ask it to label a "tax" a "fee."

Engaging in this type of subterfuge and sophistry is nothing new to West Virginia where avoiding limitations on revenue-raising ability is concerned. In *Bee v. City of Huntington*, 114 W.Va. 40, 171 S.E. 539 (1933), local governmental leaders argued that the Tax Limitation Amendment of 1932 only limited the level of taxes levied to current expenses and did not prevent the levying of taxes necessary to meet existing indebtedness even if it meant that total taxes levied would be in excess of the constitutional maximum. Judge Kenna, in a concurring opinion, identified the practical problem facing the Court:

On the one hand, it is urged that we are faced by the possibility of a breakdown of local government in a large number of the taxing units throughout the state through lack of money realized from taxation to provide for their essential functions, and, on the other hand, that the sovereign will of the people, expressed by them in the very instrument to which these taxing units owe their existence, will be thwarted in a matter of vital importance.

114 W.Va. at 50, 171 S.E. at 544.

The majority in *Bee* correctly identified the Court's duty in addressing this problematic issue as " 'the humble one of construing the constitution by the language it contains.' " 114 W.Va. at 46–47, 171 S.E. at 542, *quoting, People v. Draper*, 15 N.Y. 532, 546 (1857). The Court noted the spuriousness of the argument advanced by the local governments involved: "It is argued ... that the limitation should be ignored in levying taxes necessary for orderly government, which would mean that a limitation of levies for the operation of government

cannot be effected even by constitutional proclamation. This position ... is without legal basis." 114 W.Va. at 47, 171 S.E. at 543.

The Court in *Bee* quoted language used by the Supreme Court of North Carolina in *French v. Board of Commissioners*, 74 N.C. 692, 696–97 (1876), which when faced with a similar problem stated,

If what are often miscalled the "necessary expenses" of a county exceed the limitation prescribed by law, *the necessity cannot justify the violation of the Constitution....* The old proverb, "cut the garment according to the cloth," has in it much practical wisdom. It is illustrated every day in private life, and is the foundation of individual integrity, contentment and success. (Court's emphasis).

114 W.Va. at 48, 171 S.E. at 543. Therefore, the *Bee* Court held that the limitations on assessments prescribed by the Tax Limitation Amendment of 1932 embraced levies for all purposes, including previous bonded debts, and that the various fiscal bodies throughout the state were required to provide for the current requirements of existing contractual obligations before levying for current governmental expenses. Syllabus Point 1, *Bee, supra.*

As the Court stated in *Bee*, "The theory of organized society rests in the assumption that the community is capable of self-government." 114 W.Va. at 49, 171 S.E. at 544. Self-governance, however, can be severely crippled by misguided leadership. Taxation is a necessary prerequisite for the provision of essential services by government. Without revenue, services cannot be provided. Manipulation of labels in order to allow government to raise revenue is a deceitful exercise in which this Court must not engage. If the political leadership insists on capping available revenue through such devices as the Property Tax Limitation [Amendment] of 1982, then they must live with their decision and not expect the Court to bail them out by circumventing constitutional provisions.

An examination of the dissident opinion in the present case reveals a pretense to

engage in such circumvention because of the underlying social purpose of the fire protection charge and the consequences of labeling it a property tax. While making a *stare decisis* argument, the primary theme is that the fire protection charge is a fee rather than a property tax. This simplistic rationale is that while police protection is designed to safeguard the person and not the property, thereby making a charge based on property values a tax, fire protection is designed to safeguard property, thereby justifying basing the amount charged on property value. This proposition ignores the fact that most crimes are committed against property, and that fire protection is designed to prevent injury to human beings as well as damage to property.

Our dissident also discloses a more practical reason for his strained analysis. He believes that the Fairmont charge is a rational basis for charging citizens for fire protection and that eliminating this method will make municipal budgeting more difficult. No one would disagree with either of those assertions. However, that is not the question presented to the Court.

Property tax limitation is a fundamental part of our state constitution. Any attempt to avoid its full force and effect is not only unconstitutional, but is an affront to the very integrity of our government and our people. The City's cry and our dissident's cry is one of "necessity." Our state's founders, however, anticipating that such pleas of necessity could be used by a few to fatally undermine the constitutional foundations of our government, provided that,

> The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and *any departure* there*from, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism.*

West Virginia Constitution, art. I, § 3 (emphasis added). Save for our lone dissident, this Court refuses to stray from the wise course chartered by our founding fathers over a century ago and to avoid the plain language of our constitution under a "plea of necessity." Integrity in judges and courts is measured by firm allegiance to the language of the people as communicated through the constitution and popular referenda. The majority has vindicated the integrity of the Court.

Political leaders at the local level have made for themselves a bed in which they find it uncomfortable to lie. For example, in 1982, the West Virginia Municipal League, a quasi-public organization funded by tax dollars, W.Va.Code § 8–12–6 (1976), passed "A Resolution To Authorize A Proposed Amendment To The West Virginia Constitution, Property Tax Limitation and Homestead Exemption Amendment of 1982," which, in part, resulted in the subsequent amendment placing further limitations on the property tax as a source of local government revenue. West Virginia Municipal League, Resolutions and Policy at 2 (August 24, 1982). Ironically, One year later, five of their twenty-one resolutions proposed increases in taxation to increase local governmental revenues. *See* West Virginia Municipal League, Resolutions and Policy, Resolutions 8, 10, 12, 14 and 19 (August 16, 1983). In fact, in the present action, the West Virginia Municipal League filed an amicus curiae brief on behalf of the City of Fairmont certified by the Clerk of this Court as weighing one and three-eights pounds—some friend. The primary thrust of its brief distinguishing the instant case from *Hare v. City of Wheeling*, 171 W.Va. 284, 298 S.E.2d 820 (1982), is that fire service fees are different from police service fees because fire fees go to support firemen, while police service fees go to support policemen. Though this proposition is difficult to reject, it provides little solace, as well as little assistance in the resolution of the legal issue before the Court.

The people have imposed strict taxing limits on the power of government to impose property taxes. It does not matter that the property tax is a rational method of charging for fire protection or that municipal budgeting will be more difficult.

The people, guided by their elected leaders, have clearly communicated their priorities. They have instructed government leaders that they must devise new financing methods which do not include increases in property tax. That is the task to which such leaders must devote themselves.

Furthermore, it is not the job of the judiciary to suggest alternative forms of taxation to those found to be unconstitutional, and our dissident's suggestion to the contrary smacks of apologia. But if we must provide leadership, let us proceed with enlightened wisdom, not political rhetroic. The lesson to be learned from this case is that taxes upon real property which exceed the limits imposed by the Tax Limitation Amendment of 1932 are not valid. An approach which should work, if properly developed by capable legal minds or a legislative adjustment to the Code, would be one in which municipalities are empowered to levy a tax upon the total insurance coverage of all fire insurance policies sold within their corporate limits. This solution could easily be integrated into our existing tax structure. Such a methodology would be progressive and would tax those who most benefit from good fire protection—insurance companies which sell fire insurance policies. This tax would be easy to collect, given the limited number of fire insurance companies, and would avoid the potential equal protection problems inherent in any scheme based upon square footage.